# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 22-1125V

| | |
|---|---|
| RITA EVANS, | |
| Petitioner, | Chief Special Master Corcoran |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Filed: July 7, 2025 |
| Respondent. | |

*Catherine Wallace Costigan, Mctlaw, Washington, DC,* for Petitioner.

*Parisa Tabassian, U.S. Department of Justice, Washington, DC,* for Respondent.

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On August 29, 2022, Rita Evans filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine she received on October 1, 2020, she suffered a left shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons discussed below, I find it most likely that Petitioner suffered the onset of her shoulder pain specifically within 48 hours of vaccination, and that she is

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

otherwise entitled to compensation. I also find that Petitioner should be awarded $68,000.00 for her actual pain and suffering, and $536.00 for her unreimbursable medical expenses, for a **total of <u>$68,536.00</u>**.

## I.    <u>Procedural History</u>

This claim was initiated on August 29, 2022, and relevant medical records were filed thereafter. ECF No. 1-7, 13, 16. Although the parties attempted to informally resolve this case, they were unable to do so, and Respondent filed his Rule 4(c) Report contesting Petitioner's ability to establish a Table claim on February 21, 2024. Respondent's Report at 5-7 (ECF No. 31). On March 28, 2024, I issued a Scheduling Order setting a schedule for the parties to brief the issues of entitlement and damages. Non-PDF Scheduling Order dated March 28, 2024. The parties have now filed their respective briefs, and this case is ready for adjudication. Petitioner's Motion for Ruling on the Record ("Mot."), ECF No. 33; Respondent's Response ("Opp."), ECF No. 34; Petitioner's Reply ("Reply"), ECF No. 35.

## II.    <u>Medical History</u>

On October 1, 2020, Ms. Evans, a 68-year-old Lowes Home Improvement employee, received a flu vaccine in her left deltoid at her primary care provider's ("PCP") office, Roanoke Partners in Health located in Roanoke, Virginia. Exhibit ("Ex.") 1 at 1. Ms. Evans's medical history had no documented history of left shoulder pain or injury. Ex. 4 at 18-23.

On October 27, 2020 (26 days after vaccination), Ms. Evans sent an online portal question to her PCP, Dr. Brian Dickens, D.O., regarding a medical excuse from jury duty. Ex. 8 at 21. She also reported that she received the flu vaccination and had a "great stick," and that she "hardly felt the needle as it was lightly delivered." *Id*. at 21-22. Ms. Evans also stated that she developed a "huge knot, very hard that took at least two weeks to go away," and that she had pain with reaching and a limited reach above her head and behind her back, but that her condition was improving. *Id*. at 22.

Ms. Evans submitted a VAERS report on November 8, 2020, one month after vaccination. Ex. 15 at 3-6. The report lists the date of vaccination as October 1, 2020, and states that the adverse event began the following day. *Id*. at 3. Ms. Evans reported that she developed a "huge knot" on her arm, pain, and limited range of motion ("ROM"), as a result of the vaccination. *Id*. at 4. Ms. Evans further noted that "the knot diminished but the pain at injection site did not and continues, although compared to initial intensity at this time, which is six weeks from the time of the shot approximately." *Id*. Ms. Evans continued, "I still cannot raise my arm above my head or take it to my back as to unhook

a bra with normal range of motion and without pain. If I lay on that arm while I am sleeping, it can be in pain when I go to get up." *Id.*

On November 24, 2020, Ms. Evans was seen by Carol Blanding for a rolfing (a type of deep tissue massage) therapy appointment to treat her left shoulder pain. Ex. 10 at 3-4; Ex. 22 at 1. Ms. Evans reported to Ms. Blanding that she received the vaccination while seated in a car while the nurse administering the vaccine was standing, "letting her arm hang loosely." Ex. 10 at 3. Petitioner reported noticing an issue with her arm and shoulder the day after the vaccination. *Id*. During the appointment, Ms. Blanding noted a "hard knot lump in the upper left arm," and that Ms. Evans was in a great deal of pain and had limited ROM. *Id*. at 3-4. Ms. Evans also expressed concerns about receiving the Covid-19 vaccinations in the future, and she was unsure whether she should receive future vaccinations in her injured arm, or risk injury to her non-injured arm. *Id.* Ms. Evans returned for 16 additional rolfing visits for her left arm from December 22, 2020, to March 10, 2023. Ex. 10 at 4; Ex. 22 at 11.

On February 17, 2021, Ms. Evans returned to her PCP, Dr. Dickens, for an annual Medicare wellness visit. Ex. 4 at 11. Petitioner reported that her arm had been sore since receiving the flu vaccination five weeks prior. *Id*. A physical examination revealed limited ROM, decreased strength, and a positive Hawkins impingement sign of Petitioner's left shoulder. *Id*. at 15. Dr. Dickens's assessment was left shoulder joint pain, and he noted a concern for a supraspinatus tear and ordered x-rays, an MRI, and physical therapy ("PT"). *Id*.

On February 19, 2021, Ms. Evans underwent an x-ray of her left shoulder which revealed mild arthropathy of the acromioclavicular joint. Ex. 4 at 47; Ex. 5 at 1. Petitioner messaged Dr. Dickens again on February 19, 2021, following her x-ray. Ex. 8 at 18. She noted that she had not experienced any pain, swelling, or other issues in her left shoulder prior to receiving the flu shot in October 2020. *Id.* However, since the day after the vaccination, she was experiencing symptoms constantly. *Id.*

The MRI of Ms. Evans's left shoulder from February 24, 2021, revealed a small amount of fluid within the subacromial-subdeltoid bursa compatible with low-grade bursitis, mild superior rotator cuff tendinosis with no full thickness or complete rotator cuff tendon tears, and mild acromioclavicular joint osteoarthritis. Ex. 4 at 43-44; Ex. 6 at 6-7.

Ms. Evans underwent an initial physical therapy evaluation on March 9, 2021. Ex. 7 at 293-312. Petitioner's therapy diagnoses included left shoulder pain, adhesive capsulitis, and weakness. *Id*. at 310. She reported shoulder pain of 6/10 and limited ROM

that began the day after vaccination. *Id*. Ms. Evans also reported previously working at Lowe's but not working since March 2020 due to Covid-19. *Id*.

On April 12, 2021, six months after vaccination, Ms. Evans had a telemedicine PCP follow-up appointment with Dr. Dickens, for her left shoulder pain. Ex. 4 at 8-11. Petitioner reported steady progress with her condition but reported that her strength "is not yet where it needs to be." She still demonstrated some slightly decreased ROM of her left shoulder as compared with the right. *Id*. Ms. Evans stated that with her current progress, she anticipated being able to return to work in one month. *Id*. Dr. Dickens's assessment was left shoulder pain, and he recommended that Petitioner continue with physical therapy and consider a corticosteroid injection if her progress stalled. *Id*. at 10-11.

From March 9 to July 28, 2021, Ms. Evans participated in 44 PT sessions for her left shoulder. Ex. 7 at 164-312; Ex. 11 at 9-324. By June 14, 2021, she was reporting feeling 98% improved overall. Ex. 11 at 17, 61. Petitioner was discharged from physical therapy on July 28, 2021, as she had met "nearly all goals." *Id*. However, Ms. Evans was still noted to have "spasms and active trigger points noted throughout tight bands of musculature throughout the left rotator cuff musculature and shoulder girdle." Ex. 11 at 101.

Ms. Evans attended two acupuncture appointments in July 2021, and two appointments in April 2022, both focused on neck and back stiffness and pain. Ex. 17 at 3-7; Ex. 20 at 2-5.

On February 9, 2022, one year and four months after vaccination, Ms. Evans had her annual Medicare wellness visit. Ex. 19 at 7. She reported that her shoulder was doing much better. Physical examination revealed mild tenderness to palpation of the left shoulder. *Id*. at 11.

In her most recent declaration dated June 10, 2025, Ms. Evans states that while she has made significant progress with her left shoulder, she still has shoulder pain and continues to receive deep tissue massages and rolfing treatments. Ex. 23.

III.  **Parties' Arguments**

a.  **Petitioner**

Petitioner contends that the medical records support her claim that she suffered a SIRVA injury following receipt of the flu vaccine on October 1, 2020. Petitioner states that although she did not appear for an in-person visit until February of 2021, she reported her

left shoulder pain in an online portal note to her doctor on October 27, 2020, just 26 days after vaccination. Mot. at 12. Petitioner argues that because her shoulder pain started the day after vaccination, she has demonstrated a Table SIRVA claim and is entitled to compensation. Motion. at 16-17.

### b. Respondent

Respondent argues that the contemporaneous medical records do not demonstrate that Ms. Evans has satisfied her burden to establish a Table SIRVA claim. Opp. at. He contends that there is not preponderant evidence to establish that the onset of Petitioner's left shoulder pain began within 48 hours after vaccination. *Id*. at 7. Respondent argued that although Petitioner reported her shoulder symptoms via an online portal to her PCP three weeks after vaccination, "she did not clearly specify when her symptoms initially developed." *Id*. In addition, Respondent argues that when Ms. Evans first saw a medical provider for an in-person visit to treat her shoulder, she reported that her shoulder had been sore "since" receiving the flu vaccine five weeks prior. *Id*. However, Ms. Evans had received the vaccination more than four months prior, and five weeks prior would place her onset of pain in January 2021, more than 48 hours after vaccination. *Id.*

## IV.  <u>Applicable Law</u>

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25,

1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8; *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

V.    <u>**Analysis**</u>

**Fact Findings – Onset and Entitlement**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to

afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

Respondent has only contested the onset requirement in Ms. Evans's case. After a review of the entire record, and as set forth below, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

*Pain Occurs with the Specified Timeframe (Onset)*

In order to meet the definition of a Table SIRVA, a petitioner must show that she experienced the onset of pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(ii) (QAI criteria)).

Respondent's initial argument seems to be that because Ms. Evans did not provide a specific date/time regarding the onset of her shoulder pain when she first reported pain to her PCP in an online portal message three weeks after vaccination, she cannot meet the two-day onset requirement. Opp. at 7. Respondent further notes that 55 days after vaccination, Petitioner reported that her shoulder pain began the day after vaccination to Ms. Blanding (not a traditional medical treater) during a rolfing therapy appointment. *Id*. Finally, during Ms. Evans's appointment with her PCP on February 17, 2021, she reported that her shoulder pain began "since" receiving the flu vaccination five weeks prior. Because she included the phrase "five weeks prior," Respondent insulates that Petitioner's shoulder pain must have started in January 2021, three months post vaccination, and clearly beyond the 48-hour onset requirement. Opp. at 7. And I should not rely on onset statements in the VAERS report, Respondent maintains, because I cannot find a vaccine-related injury based solely upon the claims of the Petitioner. *Id*. at 7-8.

These are all very weak and unpersuasive arguments. First, Ms. Evans contacted her PCP via an online messaging portal *just three weeks* post-vaccination to complain of shoulder pain. Ex. 8 at 21. Although Ms. Evans did not specifically pinpoint when her shoulder pain began, the fact that she contacted her PCP regarding this pain in such a short timeframe lends support to her argument that her shoulder pain likely began within 48 hours of vaccination.

Second, Respondent questions the value of statements made by Petitioner about onset at her rolfing treatment sessions. Opp. at 7. But the fact that Ms. Blanding was not a "traditional healthcare provider" in Respondent's view makes no difference, since the evidence establishes that Petitioner specifically reported when her left shoulder pain began at this time. The Program would give equal weight to statements about onset made to other kinds of third parties.

Respondent also takes issue with the fact that Petitioner reported in February 2021 that her shoulder pain had existed "since" vaccination five weeks prior, which would place the onset of her pain in January 2021. This was clearly a mistake, however, made by Ms. Evans in estimating the time since vaccination. She clearly reported that her pain began "since" vaccination - which would have been in October 2020.

Finally, Respondent's argument that less weight, if any, should be given to self-reports by Petitioner of her onset (such as in the VAERS report) is inconsistent and ultimately unavailing. Respondent asks me to credit reports Ms. Evans made to her PCP that her left shoulder pain began five weeks prior the visit, while at the same time demanding that I ignore any of her other reports made to medical providers and in her VAERS report. And with the exception of the VAERS report, the statements Ms. Evans made reporting that her shoulder pain began a day after vaccination are contained within her medical records and were made for the purpose of treatment. I find these reports to be credible. Thus, I find that Ms. Evans has preponderantly met the 48-hour onset requirement.

## B.  Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her left shoulder on October 1, 2020. Ex. 1 at 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 3; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or

manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 2, 2020 (24 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of her shoulder injury for more than six months. *See*, *e.g.*, Ex. 4 at 8 (records of Petitioner's appointment with Dr. Dickens). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## VI.    Damages

### I.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is

inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at \*9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at \*3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

## II.    Parties' Arguments

### a.  Petitioner

Ms. Evans has requested $85,000.00 in pain and suffering. Petitioner first consulted with her medical provider 26 days after vaccination and detailed how she was experiencing consistent soreness in her left arm after vaccination with reduced reach above her head. Ex. 8 at 21-22. Ms. Evans filed a VAERS report on November 8, 2020, just over a month after vaccination, detailing how the pain at the injection site continued and how she was still unable to raise her arm above her head or take it back as to unhook a bra with normal range of motion and without pain. Ex. 15 at 4. Ms. Evans also sought treatment from Ms. Blanding on November 24, 2020, who noted that Ms. Evans was experiencing a "great deal of pain." Ex. 10 at 3. Ms. Evans attended a total of forty-four (44) physical therapy sessions. Ex. 11 at 99. In her initial physical therapy appointment five months after her vaccination, Ms. Evans reported pain of 6/10 in her left shoulder. Ex. 7 at 300. Ms. Evans also demonstrated limited range of motion in her right shoulder. *Id.* at 301. In her final physical therapy session, Ms. Evans still noted challenges in her ability to lift heavy weights but intended to continue strengthening independently. *Id.* Ms. Evans experienced a primary duration of injury for just under ten (10) months until she finished physical therapy in late July of 2021. Ex. 11 at 99.

Petitioner cites to three cases to support her requested award of $85,000.00 for pain and suffering: (1) *Schandel v. Sec'y of Health & Human Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019), (2) *Hartman v. Sec'y of Health & Human Servs.*, No. 19-1106V, 2022 WL 4444568 (Fed. Cl. Spec. Mstr. Jan. 14, 2022), and *Kent V. Sec'y of Health & Human Servs.*, No. 17-0073, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019). Ms. Evans states that she continues to have pain and discomfort in her left shoulder on a daily basis. Ex. 29 at 1.

### b.  Respondent

In his brief, Respondent argues that Petitioner suffered a mild-to-moderate SIRVA injury and should be awarded a pain and suffering award consistent with cases with similar injuries. In that respect, Respondent proposes the amount of $50,000.00 as appropriate. Opp. at 10, 25.

Respondent's position is that Ms. Evans delayed seeking medical treatment by not being seeing by a "traditional, medical provider for over four months" after vaccination. Opp. at 16. In addition, Respondent states that Ms. Evans's findings on physical examination were mild, noting the mild descriptors in the MRI report and her improved status just eight months after vaccination. *Id*. Respondent notes that Petitioner's treatment course consistent of "a few medical appointments, one round of PT, and some alleged, unconventional, rolfing 'treatments.'" *Id*.

Finally, Respondent distinguishes the cases cited by Petitioner in support of her claim for $85,000.00 in pain and suffering and cites to nine cases[4] in support of his proposed figure of $50,000.00.

---

[4] Respondent cites to the following cases: (1) *Valdez v. HHS*, No. 21-394V, slip. op. (Fed. Cl. Spec. Mstr. Feb. 28, 2024), (2) *McGraw v. HHS*, No. 21-72V, slip op. (Fed. Cl. Spec. Mstr. Feb. 15, 2024), (3) *Ramos v. HHS,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021), (4) *Mejias v. HHS*, No. 19-1944, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 11, 2021), (5) *Kleinschmidt v. HHS*, No. 20-0680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023), (6) *Green v. HHS*, No. 20-0378V, 2023 WL 6444421 (Fed. Cl. Spec. Mstr. Sept. 1, 2023), (7) *Aponte v. HHS*, No. 20-1031V, 2022 WL 4707180 (Fed. Cl. Spec. Mstr. Sept. 2, 2022), (8) *Klausen v. HHS*, No. 19-1977V, 2023 WL 2368823 (Fed. Cl. Spec. Mstr. Feb. 2, 2023), (9) *Foster v. HHS*, No. 21-0647V, slip. op. (Fed Cl. Spec. Mstr. Feb. 6, 2024).

### III.    Appropriate Compensation in this SIRVA Case

### a.  Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Ms. Evans was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of her injury. When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavits and medical records, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases.

The record in this case establishes that Ms. Evans suffered a mild-to-moderate SIRVA injury which did not necessitate surgery. Her treatment course was conservative and limited. Her left shoulder symptoms were managed mostly with rolfing and PT sessions. Her approximately four-month delay before seeking in-person treatment is consistent with a milder type of injury. *See Shelton v. Sec'y of Health & Human Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) ("[t]he fact that petitioner could cope with her injury for such a long period of time counsels in favor of a lower pain and suffering award. Treatment gaps are a relevant consideration in determining the degree of petitioner's pain and suffering"). Her actual treatment course, when she did seek out in-in person medical treatment, lasted less than four months – for a total of an approximate eight-month injury.

Petitioner cites to the *Schandel* and *Kent* cases, both of which were decided before initiation of the "Motions Day" process – intended in part to formalize damages awards in SIRVA and other Table cases. Since then, there have been more than 200 reasoned SIRVA damages decisions that I have issued, creating a body of case law for SIRVA injuries that are consistent enough to allow the parties to informally resolve cases involving a similar set of facts. While the two cases cited by Petitioner have some comparable facts, the more recently-issued reasoned decisions have trended toward a slightly lower amount awarded for pain and suffering as the understanding of the SIRVA injuries have grown over time depending upon the particular facts of each case. Thus, the decisions generated more recently have slightly more guidance value.

In the *Hartman* case, the petitioner sought in-person care relatively quickly, just 28 days after vaccination, and was prescribed a stronger pain medication than she had been taking to treat her shoulder pain. 2022 WL 4444568, *2 (Fed. Cl. Spec. Mstr. Jan. 14, 2022).  Ms. Hartman underwent an evaluation in her initial physical therapy session where the therapist noted that Ms. Hartman was experiencing significant pain during the acute

phase of her injury. Ms. Hartman underwent 21 sessions of physical therapy, and it was noted that her injury interfered with her employment and ability to train a therapy dog. ID. at *4. Ms. Hartman was noted to have an underlying labral tear and was offered a steroid injection multiple times although she ultimately declined to receive one. Surgery was even considered at one point, although it was ultimately determined that Ms. Hartman would undergo conservative treatment. Ms. Hartman was ultimately awarded $75,000.00 in pain and suffering, not the $85,000.00 Petitioner references in her brief. In contrast, Ms. Evans's injury did not affect her employment, and no steroid injections or surgery were even discussed to treatment her injury, suggesting that Ms. Evans's injury was of a milder type than the *Hartman* petitioner. I am thus inclined to award Ms. Evans an amount lower than the $75,000.00 awarded in *Hartman*.

Respondent, on the other hand, cites to nine cases to support his proposed award of $50,000.00 in pain and suffering. But many of those petitioners had a substantial delay in seeking treatment, which is not the case with Ms. Evans. Ms. Evans reported her injury fairly quickly, just three weeks post vaccination and was seen by Ms. Blanding, her rolfer, just six weeks post vaccination for treatment of her shoulder pain. Of the remaining cases without a significant delay in initial reporting, the most comparable cases are the *Aponte* and *Foster* cases. While no single case will ever have the exact same set of facts as another case, these two cases appear to be the most useful.

In *Aponte*, the petitioner also suffered a mild-to-moderate SIRVA injury with a primary treatment period of approximately seven months. *Aponte*, 2022 WL 4707180, * 5 (Fed. Cl. Spec. Mstr. Sept. 2, 2022). And while the *Aponte* petitioner was also offered a steroid injection which she declined, and possible surgery was considered, she also attended far less physical therapy, 11 sessions, than Ms. Evans, suggesting a mild-to-moderate injury. And like Ms. Evans, the *Aponte* petitioner had a significant treatment gap of one to two years between treatment which helps to draw a helpful comparison between the injuries of these two petitioners. Ms. Aponte was awarded $60,000.00 in pain and suffering. However, given that Ms. Evans attended much more physical therapy and had a slightly longer treatment period, an award slightly more than Ms. Aponte was given is warranted in this case.

In *Foster*, the petitioner was a very active mother of four children, regularly coaching volleyball, training horses, fishing, hiking and doing yoga. Foster, 2024 WL 1073009, *3 (Fed. Cl. Spec. Mstr., Feb. 6, 2024). While Ms. Foster received a steroid injection, and was prescribed a pain medication, she underwent only a total of 14 Pt sessions and her injury was mostly resolved in eight months. By her eight PT session, the petitioner was noted to be "without complaints of pain." At this eighth PT visit, Ms. Foster was able to perform her duties as a horse trainer, pick up her infant son without

pain, and perform ADLs. In contrast, Ms. Evans underwent 44 PT sessions, also had prescription pain medication, and her injury, albeit with a significant treatment gap, spanning nearly a year and a half. Ms. Foster was awarded $60,000.00 in pain and suffering. Given the additional physical therapy and the longer treatment period, a higher pain and suffering award is warranted in Ms. Evans's case.

Under such circumstances and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$68,000.00** in compensation for Ms. Evans's past pain and suffering is reasonable and appropriate in this case.

### b. Unreimbursable Expenses

#### i. Mileage

In her Motion, Ms. Evans requests an award of $856.62 for her past unreimbursable out-of-pocket expenses ($405.60 for mileage and $451.02 for medical expenses). Mot. at 21.

Petitioner has calculated her mileage using the IRS "business rate," and requests a total of $405.60. Mot. at 21. Respondent opposes this damages element, contending that the IRS "medical rate" is the more appropriate rate of calculation for Petitioner's travel expenses for her vaccine-injury related appointments. Opp. at 20. Although Respondent argues that I should diverge from prior decisions in awarding the business rate mileage for a petitioner's medical appointments, I decline to do so.[5] Accordingly, I find that reimbursement of $405.60 for Petitioner's medical mileage is appropriate in this case.

#### ii. Other expenses

Respondent agrees with the expenses of $76.43 for Petitioner's MRI and $8.02 for her PT forms, which total $84.45. Mot. at 21; Ex. 25 at 1; Ex. 26 at 14-16. Respondent objects to the $34.68 associated with Petitioner's left shoulder x-rays obtained on February 19, 2021, and the two expenses of $120.00/each for dry needling PT sessions on April 19 and 30, 2021, only to the extent that Petitioner has not produced a statement

---

[5] *See e.g.*, *Tappendorf v. Sec'y of Health & Hum Servs.*, No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb 23, 2024) (awarding the IRS business rate mileage); *Sturdevant v. Sec'y of Health & Hum. Servs.*, No. 17-172V, 2024 WL 1045145 (Fed. Cl. Spec. Mstr. Feb 12, 2024) (awarding the IRS business mileage rate); *Walter v. Sec'y of Health & Hum. Servs.*, No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) (awarding the IRS business rate for mileage); *Kleinschmidt v. Sec'y of Health & Hum. Servs.*, No. 20-680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023) (awarding the IRS business rate for mileage).

showing that these charges were actually paid. Mot. at 21; Ex. 25 at 1; Ex. 26 at 2. Given that Ms. Evans could have easily included copies of these paid invoices with her Reply and failed to do so, I will deny reimbursement of these expenses. Expenses must be *actually incurred,* or it may result in an intended windfall to the Petitioner.

Regarding the co-pay amount of $91.89 associated with a Medicare annual wellness visit on February 17, 2021, Respondent objects to payment of this charge because "this was an appointment she would have had regardless of the condition of her left shoulder since it was a Medicare annual wellness visit." Opp. at 24. While this is true, I will award Ms. Evans half of the cost of this visit, since her left shoulder was examined and treatment was provided. Thus, Ms. Evans will be reimbursed $45.95 for this visit.

In total, Ms. Evans is awarded a total of $536.00 for her unreimbursable expenses - ($45.95 (Medicare visit) + $405.60 (mileage) + $84.45 (co-pays).

## CONCLUSION

Based on my consideration of the complete record as a whole and for the reasons discussed above, pursuant to Section 12(d)(3)(A), **I find that $68,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[6] She is also awarded a total of $536.00 for her unreimbursable medical expenses. Accordingly, I award Petitioner a lump sum payment of $68,536.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.